**Thomas G. HANLON, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defend-
ant in Error.**

**No. A–14132.**

Court of Criminal Appeals of Oklahoma.

May 15, 1968.

John L. Ward and Ed Parks, Tulsa, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Hugh H. Collum, Asst. Atty. Gen., for defendant in error.

BRETT, Judge:

This is an appeal from the district court of Tulsa County, in which the plaintiff in error, Thomas G. Hanlon, was convicted on June 29, 1966 of the offense of receiving stolen property. He was tried by a jury, which fixed his punishment at a fine of $500. Mr. Hanlon was an attorney engaged in the practice of criminal law, who was disbarred from further practice of law, as the result of this conviction. Plaintiff in error will hereafter be referred to as "defendant", as he appeared in the trial court.

Because of the unique nature of this case, a brief statement of facts seems required, in order to unfold the complete circumstances involved.

In the early part of July, 1965, the home of Mr. and Mrs. Paul Fite was burglarized, and among the items stolen was one valuable "Libon Stradivar violin". Other items were also taken, but this case only involves this one violin, which was heavily insured.

Subsequent to the burglary, on or about August 16, 1965, the defendant was in the County Attorney's office [1] on business. He encountered one of the county attorney's investigators, Mr. Claude Davis, whom he also knew to be a brother-in-law

1. Presently known as District Attorney.

to the Tulsa Chief of Police, Jack Purdie. In his conversation with Mr. Davis, the defendant told him that a man—not one of his clients—came to him and informed him that he could recover some stolen violins, but to do so, the man said he would require a reward. However, the defendant informed Mr. Davis that he did not want to become involved, unless he worked through the police department. Mr. Davis informed the defendant that he was on his way to the Chief's office at that moment, so defendant asked him to inform the Chief of Police of the situation, and added, "He didn't want to get in any jam over it, that he wanted to go through the police department if they were recovered."

The State's case clearly revealed that investigator Davis did inform the Chief of Police of the possible recovery; that the Chief of Police subsequently called the State Claims Manager for the Continental Insurance Group, Mr. Ed Locke, to verify that company's insurance coverage of the property. Mr. Locke verified the fact, that the "Stradivarius violin" was insured for $20,000, and that the Company might post a reward for its recovery. The Chief of Police instructed Mr. Locke to contact the defendant, and he then telephoned Mr. Davis and instructed him to call the defendant and tell him to get in touch with Mr. Locke. However, instead of contacting the defendant, Mr. Locke left a note for his subordinate in the company, Mr. Curtis Pancost—the local claims manager—instructing him to contact the defendant, concerning the payment of a reward for the violin.

When Mr. Pancost found the note on his desk, instead of calling the defendant as the note instructed, he telephoned the Chief of Police to inquire about the details of the matter.

After his conversation with the Chief of Police, Mr. Pancost telephoned the defendant and agreed to meet with him in a coffee house across the street from the county courthouse.

After the first meeting, defendant and Mr. Pancost had two or three other telephone conversations between themselves concerning a reward figure, until that of $4,000 was reached. According to the testimony of Mr. Pancost, each time a figure was suggested, defendant had to consult with "the man" who had contacted him, and would then report back to him, until the satisfactory figure was reached.

About noon August 20, the owner of the violin, [Mr. Fite] Mr. Ed Locke, and Mr. Pancost, met the defendant at the Doyle-Jones Bonding Company office, across the street from the courthouse, where the property was returned to the owner. After Mr. Fite picked up the Stradivarius violin, and after he had played it to determine it was in good condition, Mr. Pancost called upon him to execute a company release, which signature the defendant witnessed, along with Mr. Locke. When the release was completely executed and witnessed, Mr. Pancost then withdrew from his pocket the company draft for $4,000, which he executed and presumably handed to the defendant. It seems pertinent that the draft was not executed and delivered until after the owner had possession of the violin. Nonetheless, some four months later, the county attorney filed the information against defendant, alleging the offense of receiving stolen property.

Ordinarily, in a prosecution filed under Title 21 O.S.Supp.1961, § 1713, "Receiving Stolen Property", it is first required that the State prove that the property received was stolen property. However, in this case the fact that the Stradivarius violin had previously been stolen was admitted from the outset. Consequently, with the foreknowledge that the property involved was stolen property it appears—with reference to the receiving of such property—that § 1713 provides the following to be criminal acts: every person who buys, or receives, * * * or who conceals, withholds, * * * or who aids in concealing or withholding * * * such stolen property from the owner has committed a criminal act.

Title 21 O.S.Supp.1961, § 1713 reads as follows:

"Every person who buys or receives, in any manner, upon any consideration, any personal property of any value whatsoever that has been stolen, embezzled, obtained by false pretense or robbery, knowing or having reasonable cause to believe the same to have been stolen, embezzled, obtained by false pretense, or robbery, or who conceals, withholds, or aids in concealing or withholding such property from the owner, is punishable by imprisonment in the penitentiary not to exceed five (5) years, or in the county jail not to exceed one (1) year, or by a fine not to exceed Five Hundred Dollars ($500.00) or by both such fine and imprisonment,"

The pertinent parts of the information in this case read as follows:

"That David Hall, the duly qualified and acting County Attorney for Tulsa County, Oklahoma * * * on this 23rd day of December, A.D. 1965 and gives the Court to understand and be informed that Thomas G. Hanlon on the 20th day of August, A.D. 1965, * * * did unlawfully, wilfully, knowingly and feloniously, *buy and receive* from a party or parties unknown certain personal property of value, to-wit: *One Libon Stradivar violin* that had prior thereto on the 6th day of July, 1965 been stolen from Paul Fite, the owner thereof, the said defendant knowing or having reasonable cause to believe that said property was stolen did then and there *unlawfully receive, conceal and withhold* said property from the owner thereof, contrary to the form of the Statutes in such cases made and provided, and against the peace and dignity of the State." (Emphasis added)

As stated earlier herein, the fact that the Stradivarius violin had been stolen was admitted. Therefore, the question narrows itself down to the following: Whether or not the defendant *bought and received* the violin, after which *he concealed*

*it to withhold it* from the owner? To provide the answer, we are bound by the record before this Court.

Concerning whether or not the defendant *bought and concealed* the violin, the record fails to contain such proof. We must, therefore, search the record to determine whether or not the defendant *received and withheld* the violin from the owner, as alleged in the information.

Defendant objected to the trial court's Instruction No. 5, which provided in part: "the act of receiving the same [stolen property] must be accompanied by a *criminal intent of the accused to aid the thief, or personally hope to obtain some gain or reward * * *"*

From the record, we are led to believe this instruction was based upon the rule of law announced in the case of Pickering v. United States (1909), 2 Okl.Cr. 197, 101 P. 123; and Van Wyck v. State (1934) 56 Okl.Cr. 241, 37 P.2d 321. Both cases announced the rule of law to be:

"To constitute the crime of receiving stolen property knowing the same to have been stolen, *the act of receiving or concealing the same must be accompanied by a criminal intent of the accused to aid the thief, or hope to obtain some gain or reward* for restoring the stolen property to the owner, *or in some way to derive a benefit or profit therefrom. The evidence must show beyond a reasonable doubt the fraudulent intent of the accused concomitant with receiving the stolen property."* (Emphasis added)

That instruction requires the State to prove, beyond a reasonable doubt, that the accused had a fraudulent intent accompanying his receiving the stolen property: (1) to aid the thief; or, (2) hope to obtain some personal gain or reward for restoring the property to the owner; or, (3) to derive a benefit or profit from his actions in restoring the property to the owner.

The record reflects that the prosecutor dwelled at some length—in his closing argument—on this instruction; that

he made unsupported inferences and contentions concerning defendant's "financial gains", as the result of the violin's recovery, which are wholly unsupported by the evidence. Nor are we able to find any evidence in the record that this defendant did anything to withhold the violin from the owner. To the contrary, his actions were to accomplish its return to the owner. As we view the record, it appeared to be the attitude of the police that the violin would be forever lost, without intermediation by someone.

The State's own case clearly showed that the first knowledge, concerning recovery of the violin, was provided by the defendant when he informed the county attorney's investigator.

Mr. Claude Davis unequivocally testified that the defendant stated that *he wanted to go through the police department, and didn't want to get into a jam over the recovery of the property*. The record is clear, also, that Mr. Davis informed the Chief of Police, who later called him and instructed him to tell the defendant to contact the insurance man. The only person whose testimony was any different was that of Mr. Pancost, who said that the defendant suggested it would be better to keep the police out of the recovery. But the record also clearly reveals that it was Mr. Pancost, who talked with the Chief of Police even before he called the defendant. We must, therefore, presume, if the police instructions were violated, by not informing them of the details, such violation was on the part of Mr. Pancost because he talked with the Chief of Police himself. The defendant received his instructions from Mr. Davis, and there is no evidence that the defendant acted other than instructed by Mr. Davis.

The Chief of Police's testimony corroborates that of Mr. Davis, and details the telephone conversation he had with Mr. Ed Locke concerning a possible reward to be made by the insurance company. He also testified that he subsequently met the defendant in the chambers of Common Pleas Judge Morrison, and inquired of him concerning whether or not he had been in contact with the insurance company, to which defendant stated he had.

Mr. Ed Locke testified that the first information he received concerning the possibility of recovering the stolen violin was when the Chief of Police telephoned him to verify the willingness of the company to post a reward. He also told about leaving the note for Mr. Pancost to contact the defendant. He testified that he was present when the property was recovered at the Doyle-Jones Bonding Company office, his part in the handling of the property, and that he witnessed the owner's signature on the company release form, after the defendant witnessed the same.

Certain conflicts in the testimony of the State's case appear between the testimony given by Mr. Pancost and that of another State's witness, Mrs. Wilma Lancaster, a secretary for the bonding company. Mr. Pancost said he saw the defendant drive up in a car, while Mrs. Lancaster testified that the defendant walked up to the bonding company office. However, at neither the preliminary hearing, nor at the trial was Mr. Pancost able to identify the automobile in which defendant was supposed to have driven to the bonding company office.

At the close of the trial, it was stipulated that the automobile from which the articles were taken belonged to one Sue Henderson, who was a secretary for the bonding company. The record is not clear how the defendant came into possession of the automobile keys, with which he opened the trunk of the car where the articles were found. One witness testified that defendant picked the keys up from Sue Henderson's desk, while the other State's witness said he took them from his pocket. It is this conflicting point on which the State hinges its contention of "constructive possession", coupled with the fact that defendant inserted the key and opened the car trunk.

Mr. Pancost testified that after the car trunk was opened, the owner of the violin,

Mr. Fite, *picked up the Stradivarius violin and carried it into the bonding company office;* and that *the violin was not handled by anyone but the owner.* The record shows that Mr. Pancost and Mr. Locke, the insurance company men, carried the other items into the office. Mr. Pancost, who seems to be the State's chief witness, was unable to say whether or not defendant carried anything into the office; he testified that Mr. Fite examined the violin, played it, and determined that it was in good condition. It was at that point when Mr. Pancost required the owner to sign the company release form, which he asked the defendant and Mr. Locke to witness; and then, Mr. Pancost removed from his pocket the $4,000 draft and executed it. Whether he handed the executed draft to the defendant, or what he did with it is not entirely clear. One fact which is left without any doubt whatsoever is—that the defendant was agreeable for the draft to be made payable to him. This fact seems to show either ignorance, or a lack of criminal intent on the part of defendant. However, this fact, coupled with defendant's act of witnessing the owner's signature on the release form in the presence of everyone, seems to indicate more strongly *his lack of criminal intent* more than ignorance.

The State introduced the $4,000 insurance company draft into evidence. Shown on the face thereof is the notation, *"Reward for recovery of violin".* The draft showed the endorsements: Tom Hanlon, Sue Henderson, and Doyle-Jones Bonding Company by Sue Henderson. The bank account numbers for Sue Henderson and the Bonding Company were also shown. One of the State's witnesses, Mr. Fred Koontz III, assistant cashier for the Fourth National Bank, expressed the opinion that the defendant's signature shown on the draft was the same as the one made by the defendant on a bank application form in 1959, some six years earlier. To the contrary, one of the defense witnesses, Mr. Thomas Paul Henson, assistant vice president of the Fourth National Bank in Tulsa, expressed the

opinion that all three endorsements on the draft were made by one and the same person. This same opinion was expressed by the assistant attorney general, during oral argument of the case before this Court. However, when this case was tried Sue Henderson could not be found, so she did not testify. Consequently, so far as the endorsements are concerned, one is left only with the conjecture as to who actually entered them on the draft. The failure of the State to produce this witness casts considerable cloud over the entire trial, because she obviously knew more about the stolen property than did anyone else.

At the trial defendant did not testify, but he offered four witnesses in support of his defense. Defendant's theory of defense was stated to the trial court as being twofold: first, that defendant was acting in good faith "as an intermediary for the recovery of the stolen property", and therefore at no time did he have possession thereof; and, second, if the State's theory of prosecution was to be accepted, then in that case the prosecution constitutes "legal entrapment", because of the inducement offered defendant by the law-enforcement authorities to proceed with the recovery.

To support his theory of being an intermediary, defendant cites Aldrich, et al. v. People of Illinois (1881), 101 Ill. 16, which was a case wherein the facts were most similar to the case now being considered, as well as being the only such case found.

The Aldrich case was prosecuted under a statute essentially the same as the Oklahoma statute, except that it also included the provision "for personal gain". In that case, Isaacs was a pawnbroker. Aldrich was a policeman who conceived the scheme, with another man named Levi, to recover stolen property which had been offered for sale to Isaacs. The plan was to return the property to the rightful owner. The owner put up the money, Isaacs bought the stolen property and informed Levi, who notified Aldrich where the property was. Aldrich got the stolen property and within ten minutes carried it to the owner. Under these

facts the question was posed by the court thusly: "Whether defendants received the goods for their own gain, or to prevent the owner from again possessing his property?" Answering the question, the Illinois Supreme Court said:

"It is apparent, from the evidence, that no agreement was ever made under which Aldrich was paid anything for his services,—that he expected nothing and received nothing for the services he rendered in securing the return of the goods. How can it then be said that he received the goods for his own gain? Nor did he receive the goods to prevent the owner from again possessing his property but, on the other hand, he received them for the very purpose of restoring them to the owner, which he did within ten minutes from the time they came into his possession."

Considering the facts of the instant case, we reach the same conclusion. The record contains no proof whatsoever that the de-defendant received anything for his services in the return of the violin to the owner. Also, the evidence fails to show any proof that the defendant ever had possession of the violin, whereas Aldrich had actual possession. The State's case shows the owner was the only person to handle the violin, after the car trunk was opened.

In an effort to show defendant's possession, the State relies on the theory of "constructive possession", by relating the defendant had "dominion and control" over the property *because somehow* he obtained the keys and opened the car trunk. We consider this to be too remote to meet the essential element of possession.

We have given the evidence in the record careful consideration, and reach the conclusion that the State has failed to prove, first: that the defendant bought the violin; second, that the defendant ever received the violin; third, that he received any profit, or gain from his participation in the recovery, as the court's instruction required; fourth, that there was any concealment of the violin, on defendant's part;

and, lastly that there was any effort on his part to withhold the violin from the owner. To the contrary, defendant's part in the drama was played in good faith, to assure the return of the Stradivarius violin to the owner.

The Attorney General's brief contains two propositions. To support them he quotes from 2 Wharton's Criminal Law and Procedure, § 567, relating to the mental state necessary to support the offense of receiving stolen property. While we accept those statements of the law as being valid, each is predicated upon proof of defendant's possession of the stolen property. Likewise, the statements of the law must be applied to each respective set of facts under consideration. In the instant case, the record fails to show such sufficient possession on behalf of this defendant.

To further support those two propositions, the first being directed toward "intent to aid the thief", and the second being directed toward "constructive possession", the Attorney General cites numerous cases: Jordan v. State, 219 Md. 36, 148 A.2d 292; State v. Salzman, 186 Wash. 44, 56 P.2d 1005; Hoggle v. State, 36 Ala.App. 703, 63 So.2d 289; Sledge v. State, 40 Ala.App. 671, 122 So.2d 165; People v. Jurek, 357 Ill. 626, 192 N.E. 686; and People v. Poncher, et al., 358 Ill. 73, 192 N.E. 732; but as we review those cases, none of them are applicable to the facts in the case under consideration. In each of the cases cited by the Attorney General the defendant's relationship to the thief was such as to make him an accomplice in the theft of the property, or *he actually bought and received* the stolen property with full knowledge that it was stolen property. Most of these cases are cited in Wharton's Criminal Law and Procedure to support specific statements of the law; but each case included actual possession, or such possession which properly falls within the concept of constructive possession. Possession of the property is not sufficiently proved in the case under consideration.

State v. Salzman, supra, was cited to support the State's contention that notification

of the police is not sufficient. But in that case, Salzman was a second-hand dealer, who bought, paid for, and received property he knew to be stolen property. He then notified the police that he had bought property *that might have been stolen,* in an effort to comply with the ordinance. The court held such was not sufficient to overcome the specific criminal intent involved, on behalf of the defendant. However, in the instant case the defendant informed the police prior to initiating any recovery actions, which were subsequently initiated after the police specifically instructed him to proceed. Consequently, Salzman is not applicable.

Insofar as the record is completely devoid of any proof that defendant was in any way connected with the thief, who stole the violin, we can only conclude that he was acting as an intermediator for the purpose of returning the Stradivarius violin to the owner. Such is brought out by the State's own case, and nothing to the contrary was ever shown to exist.

■ With reference to defendent's contention of "entrapment", we do not consider it necessary to discuss that proposition at length, except to state that if the State considered defendant's actions to be criminal in nature, and if the State's theory of prosecution is to be followed, then, under the circumstances of this case, we must hold that the defense of entrapment is valid. Under the State's theory, no justification can be offered to excuse the four month delay in commencing the prosecution. Considering that the county attorney's office and the Tulsa Police authorities were completely informed as to what was to take place, and as to what did take place, the State's negligence in commencing this prosecution, and its complete failure to take steps to assure that the key witness, Sue Henderson, would be available to testify at the trial, leaves us to consider the defense of entrapment, under these circumstances, to be valid. This must be so, even though the question concerning who initiated the *alleged criminal activity* is not clear, which fact is essential to a clear case involving the defense of entrapment. Likewise, the absence of the key witness, Sue Henderson, which resulted from such delay in commencing the prosecution, presents a serious question concerning the violation of defendant's constitutional right to be confronted by all the witnesses against him, and his right to cross-examine them.

■ We have considered the record in this case very carefully, and conclude as a matter of law that the State has failed to prove the allegations contained in the information filed in this case. The State's contention of "constructive possession" is too remote to be accepted. However, in reaching this decision we are not saying that constructive possession may not sustain a charge of receiving stolen property; because in a factual situation such as that which existed in People v. Poncher, et al., 358 Ill. 73, 192 N.E. 732, supra, constructive possession would be sufficient to sustain the charge. But in that case, the owner of the "Merit Auto Parts & Service", and his brothers who worked for him, knew the auto parts being bought were stolen property. The fact that he was not present when the Plymouth automobile was driven into the place of business, stripped of its parts, and pushed into an alley to be abandoned, was not enough to relieve him from the charge. The court held in that case that the constructive possession was sufficient.

We are therefore of the opinion that the State has failed to prove that the defendant bought, or that he received the Stradivarius violin; nor has the State proved that the defendant concealed or witheld the violin from the owner, as charged in the information. Therefore this case is reversed and remanded to the district court of Tulsa County, with instructions to dismiss the charge against Thomas G. Hanlon.

It is so ordered.

NIX, P. J., concurs.